OPINION
{¶ 1} Defendant-appellant, James F. Glass, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of felonious assault in violation of R.C. 2903.11. Because the trial court properly refused an instruction on aggravated assault, we affirm.
 {¶ 2} Pursuant to an indictment filed on June 20, 2003, defendant was charged with one count of felonious assault, with two accompanying gun specifications. The indictment alleged that on May 28, 2003, defendant knowingly caused serious physical harm to Levi McGowan by means of a deadly weapon. A jury trial commenced on November 18, 2003 and resulted in a verdict finding defendant guilty of felonious assault and the gun specifications; the trial court sentenced defendant accordingly. Defendant appeals, assigning the following errors:
FIRST ASSIGNMENT OF ERROR 
The trial court erred by refusing to grant defendant-appellant's request for a jury instruction on the lesser inferior offense of aggravated assault.
SECOND ASSIGNMENT OF ERROR
The trial court erred by sustaining the prosecution's objection to defendant-appellant's elicitation of testimony regarding threats made by the victim to the defendant in the presence of the testifying witness.
 {¶ 3} Defendant's first assignment of error asserts the trial court erred in refusing to instruct the jury on the offense of aggravated assault. Aggravated assault is an inferior degree of felonious assault "because its elements [are] identical to felonious assault except for the additional mitigating element of provocation." State v. Mack (1998), 82 Ohio St.3d 198, 200, citing State v. Deem (1988), 40 Ohio St.3d 205. Thus, a defendant charged with felonious assault is entitled to an instruction on aggravated assault when the evidence presented at trial reasonably would support both an acquittal on the charged crime of felonious assault and a conviction for aggravated assault. See State v. Shane (1992), 63 Ohio St.3d 630, 632
(concluding that a jury instruction must be given on a lesser included or offense of inferior-degree "when sufficient evidence is presented which would allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included [or inferior-degree] offense" [emphasis sic]); Mack,
at 200 (holding that "in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury").
 {¶ 4} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." Deem, at paragraph five of the syllabus.
 {¶ 5} To ascertain whether the requisite provocation exists, "an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be `sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case `actually was under the influence of sudden passion or in a sudden fit of rage.'"Mack, at 201, quoting Shane, at 634-635.
 {¶ 6} Ordinarily, "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." Mack, at 201, citing Shane, at paragraph two of the syllabus. Similarly, "past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." Mack, at 201, citingState v. Huertas (1990), 51 Ohio St.3d 22, 31-32.
 {¶ 7} According to the facts the state presented, Levi McGowan, Jr., resided at 1126 Fassett Avenue with his wife Brandi and their three children. As a resident, McGowan was part of the Block Watch, prompted by a couple of murders, as well as drug sales and use, in the neighborhood.
 {¶ 8} McGowan testified to having problems with defendant in the past and exchanging words with him. Specifically, McGowan noted at least three occasions where he tried to talk with defendant when his wife informed him defendant had groped her and made inappropriate comments to her. According to McGowan, he approached defendant in a public place, when defendant was with his friends, to talk to defendant and determine if statements defendant purportedly made were true, including statements that defendant wanted to fight McGowan, shoot him or "do something" to him. (Tr. 55.) Each time defendant said there was no problem, that defendant was just kidding around; the two shook hands and walked away.
 {¶ 9} On May 28, 2003, a warm spring day, McGowan was sitting on the porch with his infant son. His two older children were across the street. The neighbors across the street, with their guests, were making mixed drinks. Among the participants was defendant, who was tipsy and danced to be funny. At some point, defendant kicked his legs out from under himself and fell. Everyone laughed, including McGowan.
 {¶ 10} According to McGowan, he and his family stayed outside about one-half hour after defendant fell and then went inside to fix dinner. McGowan later started out the door to get some diapers. He was wearing basketball shorts and a t-shirt with no sleeves. Because the basketball shorts had no pockets, he had money in his waistband. As McGowan walked to the end of his building, he heard someone say his name. At first McGowan kept walking, but then he heard defendant rapping, "Yeah, 1126, I kill them bitches, Levi and shit, I kill everybody in that bitch, I hate everybody over at 1126." (Tr. 58.) McGowan took about three more steps, and defendant kept getting louder, saying the same thing. McGowan then walked to the street and said "If you got something to say to me, James, you talking about my house, talking about the people in my house, talking about hurting us, killing us. If you got something to say to me, I'm a man, I'm 33 years old, not 18 like you, come over here in the middle of the street, say what you got to say, let's settle this right now once and for all, because we've been doing this for eight months." (Tr. 60.)
 {¶ 11} McGowan testified that as he walked toward the middle of the street, defendant stood up, brandished a firearm, cocked it and said, "Now what, now what, bitch?" (Tr. 60.) McGowan stopped, stood his ground, and said "I'm afraid of guns but I'm not afraid of a bitch with a gun." (Tr. 61.) Defendant walked toward McGowan, carrying the gun, and they stood face-to-face. McGowan said, "So what we going to do." (Tr. 62.) Defendant raised his arm, and with his peripheral vision McGowan saw a gun near the side of his head; he heard a bang, but he did not feel anything. McGowan said "So what you think, I was going to run away from you or something, or punk out and run because you shot the gun?" (Tr. 62.) McGowan added, "You're a fool" and walked in the house for fear of being shot again. He called 9-1-1, and an ambulance came, transporting him to Ohio State University Hospital. On cross-examination, McGowan testified he told defendant "Oh, you shot me," but he denied moving his hands toward his pants just before defendant fired the gun. (Tr. 121.)
 {¶ 12} According to Brandi, after she heard the shot, she opened the door and saw not only McGowan walk toward the house, but defendant tuck the gun to the side as he ran in his aunt's house. Brandi went to look for defendant, and when he was not at his aunt's house, she started back to her own apartment. In the process, the police arrived. When she looked down, she saw a shell on the ground in the same area where McGowan and defendant had been standing.
 {¶ 13} Defendant presented evidence on his behalf, including the testimony of a number of the persons who were across the street on the day of the shooting and not only saw defendant's fall, but the shooting as well. According to those witnesses, defendant and McGowan had a history of disputes. Lawuan Scurry testified that two to three weeks before the shooting, McGowan came to Scurry's house and asked if he had seen defendant; McGowan politely asked Scurry to tell defendant McGowan was looking for him. Another incident occurred about one week before the shooting. McGowan came rushing out the door of his apartment and asked whether defendant was outside; everyone replied that he was not. McGowan seemed very angry, and "he said he was going to fuck him up." (Tr. 287.)
 {¶ 14} According to defendant's testimony, defendant had no problems with McGowan's wife; he did not grope her or act inappropriately. Similarly, he had no discussions with McGowan about staying away from Brandi. Defendant, however, testified to one incident that occurred about one month before the May 28 shooting. Defendant stated McGowan called defendant's cousin, Jasmine Hill, a "bitch" or a "dyke" and was generally disrespectful. Defendant approached McGowan to see what was going on, and McGowan started swearing at him. According to defendant, he was not scared, but McGowan was enraged, and defendant did not understand why.
 {¶ 15} Defendant further testified that approximately two to three weeks later, the same circumstances occurred. McGowan did not try to talk to defendant this time, but said "I'll fuck you up." (Tr. 388.) McGowan pulled out a small knife, but then walked away. Defendant, however, remained concerned because McGowan had pulled a knife on him. About two weeks before the May 28 incident, Scurry told defendant that McGowan was looking for him and was going "to fuck you up when he seen you." (Tr. 390.) As a result, defendant purchased a firearm.
 {¶ 16} According to defendant, on the afternoon of May 28 defendant tripped over a box and fell. The others with him started laughing, but across the street McGowan laughed a little louder and sarcastically. Defendant testified the laughter neither bothered him, nor hurt his pride, as he was laughing at himself. Later in the day, Jasmine and defendant were rapping, when McGowan came out of his apartment and began pacing up and down the sidewalk.
 {¶ 17} Defendant testified that as they continued to rap, McGowan asked "are you talking to me?" (Tr. 395.) At first, defendant did not respond. When McGowan repeated the question, defendant said "if you want me to be talking to you." Id. As defendant approached, McGowan "put his hand in like what I believed to be a back pocket, and as I had got up on him, he started to bring his hand out from behind him, and that's when I had took the gun from my waist and hit him." (Tr. 398.) In swinging the gun at McGowan, defendant nicked McGowan's chin, defendant's fingers slipped, and defendant hit the trigger. After the shot, McGowan stepped back, and both men proceeded to walk away. Defendant went to his aunt's house and walked "right back out her back door." (Tr. 401.) About two weeks later, his cousin called to tell him the police were looking for him in connection with the shooting.
 {¶ 18} Contrary to McGowan's testimony, defendant stated he did not approach McGowan with a gun drawn; rather, he pulled the gun out when he saw McGowan reach behind himself. According to defendant, he planned only to hit McGowan to prevent McGowan from pulling whatever he had out of his pocket, and defendant believed McGowan had a weapon in his pocket, partly because he had seen a picture of McGowan with a firearm, but also because McGowan had pulled a knife on him in the past. Defendant thought if he did not swing the gun at McGowan, McGowan would pull his weapon and hurt defendant. Defendant, however, admitted he did not see McGowan display a gun and does not remember seeing "anything about pockets" in McGowan's pants. (Tr. 402.)
 {¶ 19} Defendant admitted McGowan was doing nothing to him on that day and presented no reason for defendant to be afraid or in fear of his safety. Rather, defendant was simply "leery of the situation." (Tr. 414.) He became scared only when McGowan seemed to be pulling something out of his back pocket.
 {¶ 20} On these facts, the trial court did not err in refusing to instruct the jury on aggravated assault. Initially, application of the objective standard in determining serious provocation reveals a lack of evidence to support that prong of the analysis. While the evidence, though contested in some aspects, revealed prior incidents between defendant and McGowan, those incidents preceded the May 28, 2003 assault by days, and even weeks. Because defendant had time to cool off from the prior incidents, they do not satisfy the test for reasonably sufficient provocation. Huertas; Mack, supra.
 {¶ 21} Moreover, an examination of the evidence relative to defendant's and McGowan's actions on May 28, 2003 fails to provide sufficient evidence of provocation. Defendant admits McGowan was doing nothing to him on that day and provided no reason for defendant to be afraid or in fear of his safety. Instead, defendant and McGowan exchanged words, and words alone generally do not constitute reasonably sufficient provocation to incite the use of deadly force. Shane, supra; State v.Street, Licking App. No. 02-CA-0018, 2002-Ohio-4058 (concluding evidence of verbal exchange between defendant and another bar patron did not warrant instruction on aggravated assault in prosecution for felonious assault of the other bar patron with a knife, as the exchange did not constitute serious provocation of the defendant by the other bar patron).
 {¶ 22} Defendant, however, asserts the evidence demonstrates more than just words because, according to defendant's testimony, McGowan reached toward his backside. Indeed, defendant testified he only became afraid when McGowan seemed like he was pulling something out of his back pocket. No evidence indicates McGowan had either a knife or gun on his person. Moreover, disputed evidence addressed whether McGowan even had pockets in the pants he was wearing at the time, as defendant himself testified he saw "nothing about pockets" in McGowan's pants. Shane, supra (noting that "[t]o require an instruction to be given to the jury every time `some evidence,' however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense").
 {¶ 23} If, however, we assume McGowan was reaching toward something in a back pocket, McGowan's actions arguably do not constitute sufficient provocation. See State v. Poe (Oct. 6, 2000), Pike App. No. 00 CA 09 (determining victim's actions in coming toward defendant with a hammer and stating "come on" did not rise to the level of sufficient provocation). Even if we were to further assume such action constitutes sufficient provocation when combined with the verbal dispute between defendant and McGowan, the issue resolves to applying the subjective standard and determining whether defendant was actually under the influence of sudden passion or a sudden fit of rage.
 {¶ 24} Defendant here unequivocally testified that he was not enraged, but just "leery of the situation." (Tr. 414.) Indeed, defendant explicitly testified that McGowan's laughing at him did not bother him and did not even hurt defendant's pride, as defendant too was laughing. See State v. Collins (1994),97 Ohio App.3d 438 (noting that the defendant's "own testimony did not support and completely undermined any claim that his actions were in fact incited by serious provocation," as defendant did not testify he was provoked, angry or had lost control of his temper); State v. Crim, Cuyahoga App. No. 82347, 2004-Ohio-2553 (noting defendant's testimony he was "cool, calm and collected").
 {¶ 25} Moreover, even if defendant became afraid when McGowan reached toward his back pocket, defendant's "claim that he feared for his own safety did not constitute sudden passion or rage as contemplated by the aggravated-assault statute." State v.Dixson, Hamilton App. No. C-030227, 2004-Ohio-2575; Mack, at 201 (noting that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage"); cf. State v. Napier (1995), 105 Ohio App.3d 713, dismissed, appeal not allowed, 74 Ohio St.3d 1498 (concluding that use of a deadly weapon is impermissible in response to mere words, and even vile or abusive language or verbal threats, regardless of how provocative, do not justify use of a deadly weapon); State v. Ratcliff, Franklin App. No. 01AP-1349, 2002-Ohio-3727 (determining that defendant's fear and the victim's lunging at defendant with a knife did not demonstrate that defendant acted out of sudden passion or rage). See, also,State v. Maggard (June 4, 1999), Montgomery App. No. 17198 (concluding defendant's acting out of fear the victim would hurt defendant or his friends was not anger or passion as a result of the victim's provocation).
 {¶ 26} Nonetheless, defendant contends on appeal that, despite his own testimony, other evidence indicated defendant was enraged. Defendant, however, points only to those factors we have already addressed, and those factors, such as verbal threats, past incidents, and vile or abusive language, are insufficient to warrant an instruction on aggravated assault. In short, the trial court properly denied defendant's request for an instruction on aggravated assault, as even if the record contains sufficient evidence of provocation in McGowan's reaching toward his back side, the evidence is insufficient to prove defendant was in a sudden fit of rage or passion at the time of the shooting. Defendant's first assignment of error is overruled.
 {¶ 27} Defendant's second assignment of error asserts the trial court erred in precluding defendant from presenting evidence regarding McGowan's threats to defendant.
 {¶ 28} Defendant's contentions are unpersuasive for two reasons. Initially, as discussed under defendant's first assignment of error, the threats were themselves insufficient to warrant an instruction on aggravated assault. Moreover, other witnesses addressed the threats McGowan allegedly made to defendant; the testimony subject of defendant's second assignment of error would have been merely cumulative of other evidence in the record. Because other evidence in the record sufficiently made the point that McGowan allegedly threatened defendant, defendant suffered no prejudice in the trial court's ruling. Accordingly, defendant's second assignment of error is overruled.
 {¶ 29} Having overruled both of defendant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Lazarus, P.J., and Bowman, J., concur.